Good afternoon.The case that we have this afternoon and the only case, and by the way, I should note that Judge Weiss is obviously appearing via video conference from Pittsburgh. We have numbers 06-5173, 06-5196, 07-1010, 07-3398, and 07-3416, Marion v. TDI, and 07-3197. And we have on behalf of the Appellant's Cross Appellees, Mr. Stearns and Mr. Mester, is that correct? And then on behalf of the Appellee Cross Appellant, Mr. Lewis. Yes, Your Honor. Okay, thank you. May it please the Court, my name is Gene Stearns, and with Matthew Buttrick, we appear on behalf of the Appellant, Peninsula Bank. There are obviously, as you have seen from our briefs, four principal issues that we raise. The first is standing, as to whether the receiver has the standing to pursue the actual claim that the receiver pursued. You clearly made the standing argument. How come you didn't mention Kaplan? An oversight of cosmic dimension, Your Honor. We did obviously argue cases that relied upon Kaplan, but Kaplan, as a Supreme Court decision that bears directly on the issue, should have been mentioned. And we obviously appreciate the Court asking for additional briefing on the subject. The second issue, of course, is the issue of whether harm could have been caused by the alleged acts of Peninsula Bank. The third issue is the calculation of damages that the receiver presented to the jury. And the fourth is the issue of the 60B3 motion, which related to an expert witness who was told, indisputably told, not to volunteer the fact that after Peninsula Bank made these loans, that in fact the fortunes of the receiver of the estate rather improved by $20 million rather than diminished. And the serious nature of that instruction, which violates the Pennsylvania Code of Professional Responsibility. First, with regard to standing, we certainly recognize, as the Court has brought to everyone's attention, the fact that the Kaplan decision and its application here. We also recognize, and in fairness, one of the reasons that we cited more current cases, because Kaplan has been chipped away from, to some degree, by the circuits, addressing the issue of where there are circumstances where a corporate harm can be individually identified and pursued on behalf of the corporation, the receiver may do that. I don't believe, incidentally, that Kaplan would have said anything other than that. The issue in Kaplan was, could the receiver pursue claims on behalf of the individual investors? And so, Your Honor, I forgot to mention that I wanted to reserve three minutes for rebuttal. No, not a problem. We'll get you back either way. Okay. So you're conceding that a receiver would have standing, for instance, to sue for breach of fiduciary duty to the corporation? If, in fact, the damages were the kind of damages that were not on behalf of the individual investors, yes. The receiver does have an opportunity to bring claims. It's just that you can't have, in this case, the tail wagging the dog. And in this case, as we brought to the Court's attention, from both the opening statement and the closing arguments, which are bookends in this case, that summarize that the corporate interest asserted here was nominal. And even the judge's statements to the jury, I think, could be interpreted. Quite clear. And, in fact, what you have here is simply taking Kaplan to the extreme. And essentially, if it were allowed, would thumb the Court's nose at what the Supreme Court has ruled. And I might add, incidentally, that the logic of what the Court ruled in Kaplan, that was a 1972 decision, has since become even more clear as receiverships have expanded and court-appointed receivers have appointed law firms, sometimes their own law firms, to pursue these claims. They've become engines that have their own life beyond the pursuit of claims that an individual investor might pursue. And on grounds that individual person. We have a rather famous case from the circuit where a former circuit judge appointed his own law firm. The district judge said it was okay for him to be involved, then nixed his firm being coming involved. And that was reversed by our court. Well, those circumstances, and Judge Posner wrote an interesting decision in the Maxwell versus KPMG case we've cited, and that was cited in 520 Fed 3rd, 713, in which he addressed similar issues involving a trustee or receiver who pursued such claims. More specifically, the issue also arises because of the Sytex decision of this court, where, in fact, the court held that an accounting firm, which was retained by a company to, in fact, do an audit, does a negligent audit, fails to identify all kinds of problems, misses a host of red flags. In this opinion, this court identified all those red flags, but the net result of the audit was additional investor money came into the company, and the court held there's no harm that comes from that outcome. Now, some third party may sue. Now you're going to be on standing. Yes, I'm moving to harm. Standing, unless Your Honor wants, we have seven minutes. I was trying to cover it. What about, before we move on, anything about Shoals at Seventh Circuit? Well, I think that you have Shoals as well as, and I would say here there may be a conflict in the circuits, because you have clearly two circuits. Actually, there's no conflict yet, I should say. There would be a conflict if there's an affirmance here, because both Shoals and the Eleventh Circuit have held that a Ponzi scheme, for example, cannot create standing by the estate because it's just a matter of law. You cannot have standing if you're the proponent of the Ponzi scheme to, in fact, sue because of the Ponzi scheme. But I might point out, incidentally, in this case, and this goes to the issue of harm, because all these issues are interrelated, by the way. Because Peninsula Bank, what it did was allegedly made three loans, and it made three loans based on financial statements that showed that the company was quite solvent, had capital. And so it's alleged its wrong was putting money into the company for brief periods. And while the plaintiff and receiver below used colorful language by, you know, driving the getaway car and receipt of stolen property and holding the gun at the scene of the crime and all these kinds of nice adjectives and adverbs that created a colorful view, the reality is that a Ponzi scheme is like musical chairs. And when the music stops, there are not enough chairs to sit in. And Peninsula Bank, had the music stopped when it had, for that brief period, $9 million outstanding, if, in fact, it was holding collateral owned by someone else, would have been in the crowd of people looking for chairs where there weren't enough and would have found itself an unsecured creditor. And so the alleged wrong is loaning money based on financial statements. And so what you had is this court in Civics says, negligence cannot be the basis for a claim for increased insolvency. So these folks just simply described negligence and called it willful blindness. And so the willful blindness was a bank makes a loan, and in fact where it exposes itself and its depositors and its insurance company, the FDIC, to the risk of loss that the loan would fail, it's nothing more than volunteering for the musical chairs. What were the actual claims that were put to the jury? Was it aiding and abetting? Add five more minutes, please, Marina. Aiding and abetting, it's hard to say what was actually put to the jury because the instructions. Obviously, in the end, you can't have aiding and abetting because of the Supreme Court case from 94. But that would assume to be the case. And you would obviously not have a negligence case in light of Lafferty, rather in light of Civics. So what the receiver says was put to the jury is aiding and abetting breach of fiduciary duty. However, there was no instruction on breach of fiduciary duty. There was no instruction on aiding and abetting breach of fiduciary duty. And the question that the jury answered was a question which is, do you find that the Peninsula defendants either conspired with or aided and assisted Robert Bentley in his fraudulent activities? So the allegation was presented to the jury as fraud, aiding and assisting fraud. The point there is I'm not sure that Cytex really helps you. If Cytex says that you cannot have as a damage theory of damages with respect to a negligence claim the concept of deepening insolvency, this isn't negligence only. Well, actually, what Cytex says, I believe, and forgive me for telling the court that wrote Cytex what Cytex says, but I just have the benefit of reading it. And Cytex, it seems to me, says quite clearly that in any tort case, the measure of damages has to be traditional tort remedies approximately caused by the wrong. And that you, I believe the court made quite clear, at least I thought it was quite clear, that increased insolvency is not a substitute for measuring damages in a tort case. It is merely a cause of action. Well, the case there was negligence. Basically, do you have somebody acting negligently, having a duty? Two, do you have a harm to the plaintiff? And three, was that particular harm caused by that particular breach? Yes, Your Honor, there's a footnote in Cytex which I believe attempts to, at least as I read it, adopt the same language for fraud specifically. You mean footnote eight? Yes. We're saying we're leaving a slate clean, but what I was attempting to do was to say that what I had said before doesn't mean it couldn't apply somewhere else, but we just don't have that case before us. Well, again, forgive me to even suggest that I can say what Cytex says, and Your Honor wrote it and I didn't, and I just read it. Sometimes I can't remember what I wrote. But I certainly drew the impression that the court was intending to say that you're not creating a measure of damages different than exists in the common law. And that the idea of increased insolvency is not a measure of damage. It's a cause of action. But incidentally, having taken us there, because all these issues are interrelated, it takes us to the measure of damages. And, in fact, what this plaintiff did was not to argue for increased insolvency. Peninsula Bank incidentally comes in in late 1999, and according to their own expert's affidavit after the trial, he was told not to volunteer the fact that the company actually improved its financial position by $20 million after 1999. All this plaintiff did, this receiver did, was to say the total insolvency over the entire life of the corporation, which goes back to 1964 or 84, so the entire life of the company was compared to how much money was left to pay investors, their principal, and all of their interest. And excluded from that calculation, because it was just measured as of the day of the receivership, using face value for the certificates of deposit, when the very Ponzi scheme that existed, existed because the face value of certificates is not the same as its actual value. The maturity of the certificate and the rate of interest that's charged created a whole different value. Wasn't that expert really just a liability expert? He offered an expert report which unequivocally discussed at some length the market value of these CDs over this period of time. And so while at the time of trial they limited it to a certain scope, his expert witness report talks about the market value of the CDs through 2000. And so while it is true that at trial they attempted to limit it to a liability claim, they offered to the court pre-trial, while the parties were preparing for trial, an affidavit from him, an expert witness report under the federal rules of procedure, that purported to describe his testimony in much broader terms. And so now what you have, I don't care how you slice it and dice it. You could have hired your own expert to counter him. I agree. And the Pennsylvania rules of ethics should say it's okay to tell an expert not to volunteer. But that's not what they say. What they say is that you cannot counsel a witness not to volunteer information. And that's what happened. And so while we can, and we all know the receiver is attempting to put off on essentially a legal malpractice claim, the way in which the case was defended by the firm that then defended it. The reality is there's an affirmative duty of candor to the court that was clearly breached in this instance. There's, by the way, no factual dispute about this. The affidavit was offered by him. They don't rebut it. They admit it. The trial court accepted it as true. And so what you have is a gentleman who filed an expert report that talked about the market value of these assets. You have an attempt to put on, in fact, put on face value of assets as opposed to market value. And then you count in damages the interest expense that is going to occur over a period of five or six years, but don't count any of the interest income that's received from the $400 million that's being held by the receivership estate. So what you have is on each four, any one of these four issues is grounds for reversal. And frankly, respectfully, what happened in this case is a Florida bank is identified as a bank down there, and we have little people up in Pennsylvania, credit unions and police unions and da-da-da-da-da, all of which are paraded in front of a jury. Well, at this point, why don't we – I got you. And why don't we hear from Mr. Mester, and then we'll get you back on record. Thank you. Good afternoon. May it please the Court. My name is Lawrence Mester, and I represent Southeastern Securities. It's an SFT financial group. And the Ben-Ghiat defendants and Ted Ben-Ghiat. I respectfully request reserve two minutes of my five minutes for rebuttal, please. That's fine. Thank you. I'm probably going to give you five minutes anyway. Thank you. The verdict in favor of the receiver and against the Ben-Ghiat defendants in this case was a miscarriage of justice that demands reversal. I mean, the key issues for us are essentially whether they're standing. And then whether the – if there is standing, do the damages that are alleged here – if there's not standing, do the first two types of damages alleged, are they really investor damages as opposed to damages of the entity that Mr. Merian is a receiver for? And then for the third damage claim, which is deepening insolvency, is that a valid theory of damages in this context, even if there is standing? It is not, Your Honor. The damages claimed in this case are solely those of the investors. And as Mr. Stearns has reiterated and reiterated over and over again, the entire basis of this case, the entire presentation of this case on behalf of the receiver was an effort on behalf of the receiver to recover those sums that they claim a right doing owing to the investors. Now, let's just – under the one theory of damages, it was, what, $31 million? Another was $32 million. And what was the deepening insolvency theory? Deepening insolvency theory was – I mean, what was the amount claimed under that? I do not have that number offhand, Your Honor. But as the Court has – as Mr. Stearns had indicated in the In Re Sitex case, you didn't even have a deepening insolvency here. If you use the Burdett theory of damages, at the time that the original loans were made from Peninsula Bank, the insolvency was approximately $40 million. By the time you got to the date of the receivership, which was October 23, 2001, the amount of insolvency was in the area of $23 million, not including what the receiver contends to have been contractually owed interest. And so what you have here, Your Honor, is a situation where the extension of the life of the company, to the extent that either the Peninsula defendants or the Bengayat defendants actually did prolong the life of the company, actually improved its balance sheet. And then the other issue comes into, well, how do you then differentiate between the different levels of investors who were in the case or not in the case at the time? Certainly those who were paid during the initial periods of time during when the loans were made and got out of the case were fine. Those new investors that came in and that were then left, quote-unquote, holding the bag were the ones who actually have the claims against BFS and the related corporations. One of the issues that we had wanted to discuss, I see that my time is up with this issue, and in terms of proximate cause, we had argued vigorously that the doctrine of respondeat superior was not appropriate in this case for a variety of reasons. One of which, that the case that went to the jury was not a securities violation case. It was not a 10B case. We are not disputing that there was a broker-dealer relationship. But when you talk about the heightened duty of supervision, the heightened duty of supervision arises in the context of protection of investors, not protection of the corporate entity for whom the broker works for. And so once again, you have a situation where the receiver is attempting to insert causes of action that are more appropriately causes of action for the investors as opposed to BFS. Who did the bankiat defendants have a duty to protect vis-a-vis their heightened duty of supervision? Not BFS. It was the investors. And the insistence of the receiver on including the respondeat superior charge in the case further supports the contention that the entirety of this case was for the benefit of the investors and not for the benefit of BFS. We respectfully request the court reverse Judge Fulham's decisions. Thank you.  Mr. Lewis. May it please the court, my name is John Lewis and I represent the receiver. We're going to start with the same question with you we had with Mr. Stearns, which is how could you not cite Kaplan and deal with it? I mean that's an Achilles heel, at least on its face. Kaplan was cited, Your Honor. In your red brief? No, at the district court level it was cited. But in your brief, I don't see it in their brief either, but in your brief starting on page 42 you have the receiver at standing to assert the claims to the jury and you have basically two pages and I don't see anything on Kaplan. Well, I mean, I understand your point. I'd like to ignore the Supreme Court, but I can't. Well, but in the Lafferty case, this court was asked to construe Kaplan and how Kaplan applies to the claim of a committee on behalf of the unsecured creditors so that before this court is a decision by a panel of this court. But you didn't deal with me. Let's assume that's the case. Let's assume somehow Lafferty distinguishes Kaplan. You've still got to deal with that in your briefing. I mean, otherwise when you take the case that's key against you in terms of standing and you don't deal with it, it hurts your credibility. Well, with all due respect, Your Honor, in the Kaplan case, the court was very clear to point out that the receiver was not attempting to assert claims on behalf of the entity itself and distinguished the case of McCandless. The Kaplan stands for when the receiver is attempting to bring actions on behalf of third parties. Thou cannot do. Right. Because he only steps into the shoes of the party that he's the receiver for or the trustee for. No question about that, Your Honor. And so in this case, the argument of the other side, they did make the standing argument. They didn't make the Kaplan argument specifically, but they did say that they challenged standing. So they haven't waived it. No question about that. They haven't waived standing. Well, just a minute now. You know, apart from in paragalecto, your sole response to defendants' standing arguments was that they conceded standing. Now, don't we have an independent duty to review our jurisdiction? I don't care what they conceded. Isn't that right? Absolutely. All right. It's an independent duty. So what they concede doesn't matter at this point. We're here to determine whether or not we have jurisdiction. That's true, Your Honor. But there's a difference between conceding standing, which is meaningless. I agree with you. But if you concede that the claims of BFS were submitted to the jury, that is a factual concession, which I think is relevant. Well, when I look through, let's just go through the jury instructions here. And I guess he starts on 1751 or thereabouts. But then he then says, after a couple of pages, let's let counsel do their summations. And then I have him picking up around 1892 or thereabouts. And going through, I did find on 1896 that Judge Fullen said the defendant bank and Benghia companies knowingly enabled Bentley to continue the fraudulent scheme longer than it would otherwise have been possible to continue. They did that by either lending or by making money available to him. Let's put it that way. Then the court goes on later on and essentially says that the argument, Jury, you should understand that the argument here is that somehow these defendants enabled this Ponzi scheme to continue. And then I find, let's see, on page 1899, the court says, in order to be guilty of conspiracy, it must appear that the defendant knew of the illegal activity and agreed it should take place. In order to be guilty of aiding and abetting or aiding and assisting, it must appear that the defendant, whose case you are considering, knowingly and assisted the wrongdoer in carrying out the fraudulent scheme. Then it says on the next page, 1900, on lines 22 and 23, or 21 through 23, they argue that the damages amount to all of the money that was invested in the receivership estate after the loan was agreed to. So that looks like the investor's money. Then I go to the next page and they talk about, and it's interesting, on page 1901, if you have it there, I'll just, I'll wait. Did you hit 754 where he talks about the Emerson disaster? Yes, Your Honor. I'm not sure I did. On page 1901, they're saying a little over 24, lines 3 and 4, a little over 24 million was invested by investors after that, and therefore that is the amount of principal. Line 7, they also claim that the receivership would be entitled, the investors would be entitled, so he corrects himself to claim interest on that money. And I could go on and on to where the court is making it clear that what we're talking about is the damage done to the investors. And also Judge Manatorpin has some other quotes. The court further stated, freed from Douglas' spell, the corporations became entitled to the return of the monies for the benefit not of Douglas but of innocent investors. Sounds to me like that jury was told that the recovery here is really for the investors, or at least that's the measure of the damage. There is no question that the jury understood that any recovery by the receiver would not be kept by the receiver or go to Robert Bentley, that it would go to the investors. And this court in Lafferty said. Well, why would that matter? How would that be relevant to a juror's decision who was going to get the money in the end? We're talking about here who was entitled to the measure of the damages. It sounds to me like your theory was that the receiver is representing the innocent investors. Will you concede that the receiver could not represent the innocent investors? Yes. Okay. Yes. Okay. But I do not concede that there could not be damage to BFS and the same amount of damage to the investors. In fact, that's what Lafferty dealt with. So long as there is a damage to BFS, it doesn't matter, and this court has said in Lafferty. What Lafferty says is under Pennsylvania law, you can have as a cause of action the concept of deepening insolvency. It really doesn't talk about damages. There's some language in there where they quote from the district court that one might construe it that way, but the court made it pretty clear it was not talking about damages. And then when I wrote Cytex, Judge Fuentes was on that panel, and I think it was very clear that it's been cleared up. Lafferty says under PA law, there is a cause of action that can be called deepening insolvency. That's it. All right. Let me take the court through what was said because the court is focused on statements in the instructions. Before the closing argument, the court went to great pains to talk about the nature of the claim being made, which was on behalf of the receivership estate. And I think what has been lost, perhaps, is the issue of how this Ponzi scheme worked. Under the Ponzi scheme. He was basically doing mismatching because he had to rob Peter to pay Paul. But what is important is where the money went. Where the money went. Under the Ponzi scheme, BFS had the liabilities. Now in their third set brief, the Peninsula defendants for the first time changed the position that was at trial. And I think at least they're bound by the factual admissions made at trial. BFS has all the liabilities. But the investor money goes to Entrust. And that is where the damage to BFS begins to build up. The same thing with these Peninsula loans. They quote Citex, but in this case, the money went from Peninsula not to BFS. It went to Entrust. So the theory of the case, and with all due respect, the merits of a cause of action is not a standing question. In pari delicto is not a standing question. What we argued to the jury. But what is a standing question is if you are, as a receiver, suing on behalf of third party investors. If you are, then you've got a problem. If you're not, you don't. I agree. And the legal theory that we advanced at the charge conference, that we advanced in the complaint, was that BFS was damaged when Bentley caused it to incur the liabilities and the money went to Entrust. That BFS was damaged by the loans because they never got the money and yet the scheme was allowed to continue and therefore the damages increased. So what do you, just to make, of the 23 million of principal that you're talking about, where did that, the investors put the money and you're saying it did not go or a portion of it did not go to BFS? The large majority of it did not. No, that was the beauty of the Bentley scheme. And the idea that somehow this money helped BFS, which is sort of their standing Cytex damages argument, is just factually untrue. The money went to Entrust. In other words, to Robert Bentley. The liabilities went to BFS. You've got three theories of damages. The third one is deepening insolvency. Yes, Your Honor. That's made clear at page 1911 and thereafter. There were three. Contractual obligations, new money, and deepening insolvency. Now, the first two, their argument is that what you're really doing is almost dollar for dollar, talking about the amount of monies that the investors put out and therefore should get back. In other words, if you had recovered that 31 million or 32 million and it had been paid, to whom would that money go to once it came to the receiver? It would go to the investors. There's no question about that. Isn't that game set and match? No. Because the alternatives are keep it himself or send it to Robert Bentley. Well, I realize it's not bankruptcy, but because of securities, you're saying it would all go back out to the investors. BFS was wholly owned by Robert Bentley. And I cannot believe that there's somehow some rule that for standing purposes, counsel are prohibited from telling the jury where the money will eventually go. This whole question of allowing a receiver to sue, obviously, is a question of the technicality of the standing principle. But it can't be the law that if BFS sustained legal damage, that somehow when I or somebody makes a closing argument, I can't tell the jury that's where the money is going to go. The jury understood. But the key thing, in looking through this transcript, it gets conflated. Who was harmed? BFS. Did you make that clear? Yes. I said in my opening statement, quote, the evidence will also show that these acts also damaged Bentley Financial Services, or BFS, by increasing its liability to the investors. It was BFS, while under the control of Bentley, that made the investment contracts with the investors. That's at page 394 of the joint appendix. And immediately prior to the closing arguments, the court gave an extended instruction on the nature of the claims. And then in closing arguments, Mr. Mester referred to the liability question as whether or not his clients are liable to BFS. And I referred to the damage issue as to what BFS promised to pay. But in that instruction you said that Judge Fulham gave to the jury, did he make it clear that this was a recovery on behalf of the corporation and not the investors, and that that was merely the measure of what the damages would be? What were his words? The particular portion you just read, do you have that handy? I think I do, Your Honor, yes. I mean, I know it's very nice what counsels say in their openings and closings, but we all know juries are told not to pay a lot of attention to that. Well, except that that seems to be the big argument from the receiver and the court's questions to me about... I realize that, but I'm interested in the jury charge. That's the guts of the matter. All right. This is what the court said. The receiver has an obligation to take over the assets of the business, all of Mr. Bentley's assets. What page are you on? 1753, Your Honor. All of Mr. Bentley's assets, all of the assets of Bentley Financial Services and so forth, and also is empowered to collect any monies that might be due the businesses. This lawsuit is an attempt by the receiver to collect money which the receiver claims should be due the receivership because of the implication of the defendants in some of Mr. Bentley's activities. And I can even add on to that. On page 1907, it talks about the cause of harm to the receivership of the estate, and in 1908, it talks about caused the plaintiff's damages on line 20, and on 1918, it talks about on line 12, if you find one or more defendants is liable for damaging the receivership. So there's language that way. The red light is on here, Your Honor. No, you're fine. Marina, if you'd have five more minutes. So there's clearly language going your way, but there's also, you've heard me read, a lot of language going the other way. All right. But if I can pick up on an earlier point that the court properly addressed to me, standing is not an issue to be resolved by the jury. Standing is an issue to be resolved by the district court, and if necessary, by this court. And what did the district court do? And the district court, there was a motion pre-trial to dismiss on lack of standing, and this was all thrashed out, and we made the technical argument that technically the receiver is suing on behalf of BFS, and technically we are alleging a damage to BFS, which by the way is all going to go to the investors and so forth. And Judge Fulham resolved that. They made a new motion for summary judgment before trial. He denied that. So I don't think that we stand or fall on standing, not to make a pun, about whether we argue standing to the jury. The jury was told enough to understand that this was a claim by the receivership estate, and they understood that the money that they awarded will go immediately to the investors. And if Lafferty means anything, it has to say that that's all right, because Lafferty said that was irrelevant. Said what was irrelevant? That any money that the committee recovered in Lafferty would immediately go to the investors or to the creditors. In other words, the... What would happen in a bankruptcy context? It would go, it would be ultimately distributed out to all the creditors, starting with your secured claims, then your admin claims, then et cetera, et cetera, et cetera. I'd like now, Your Honor, if I could to address the damage claim, because... Yeah, let's do that. One question. There were two theories here. There were aiding and abetting, and then there was conspiracy. I assume, I don't see how you can, in light of the 1994 Supreme Court case in Central Bank of Denver, make an aiding and abetting claim. It was a case of aiding and abetting Bentley's breaches of fiduciary duties, which there was an agreement at the charge conference. We had multiple claims. Okay, so you're saying it was not... They all related to knowledge and to assistance. There are four elements on aiding and abetting breaches of fiduciary duty, and Judge Fulham, in his post-trial opinion, said that was submitted to the jury. Bentley was president of BFS and had a fiduciary duty to BFS. That's a matter of Pennsylvania law, no factual question. Bentley breached that duty, no factual question. Two factual questions that the jury had to resolve were knowledge or willful blindness, and they resolved that. So it is our understanding that, and Judge Fulham's understanding, that the jury, by answering yes to the liability interrogatory, said that there was liability under Pennsylvania law. Now, as to damages, at the trial, and we're talking about what actually happened at the trial, not what should have happened, trial counsel for the Peninsula defendants made the tactical decision not to challenge the damage claim asserted by the plaintiff. After making one initial objection, the only objection to the damage claim of the plaintiff at the trial was a one-sentence statement that, Your Honor, we object to this testimony for the reasons stated in the motion. And the motion was a two-sentence motion, which said deepening insolvency testimony should not come in because there's no evidence of wrongful conduct. And Judge Fulham properly overruled that on the basis that, first, it was not deepening insolvency stuff, and secondly, that there was evidence of intentional wrongdoing. And the testimony that came in was the testimony of Francis Berlinski, an expert witness on damages. And what I have here from page 1,000 is, Mr. Roberts, Your Honor, I'd like to object to this line of questioning for the reasons stated in the motion I made this morning. Court, the motion to eliminate is going to be denied. Let's go ahead. That's right. I don't see, where's the reasoning? I mean, you just said he's going to deny it. All right. Well, then let's deal with the motion. The motion, if that is error, it has to be error. My red light's on. No, go ahead. It has to be error based on what was tendered to Judge Fulham. And what was tendered to Judge Fulham was basically a two-part argument. That's it. Number one, this is deepening insolvency. And number two, you don't have any evidence of wrongdoing. And the testimony that came in through Mr. Berlinski was $23 million in principal and $9 million of interest. And in the cross-examination of Mr. Berlinski, there was no objection to his computations, no objections to his qualifications. And the evidence of record introduced by the defendants is consistent with Mr. Berlinski's testimony. For example, in their opening statement, the Peninsula defendant said, Bob Bentley stole $23 million, which happened to be the principal amount of the claim. The conservative nature of the damaged claim is also shown by the fact that interest was cut off as of the date of the first distribution. In fact, the Peninsula defendants at trial or post-trial introduced evidence that the amount owed by BFS to the investors was some $36 million. But the important thing to remember is once Mr. Berlinski's testimony came into, trial counsel, not Mr. Stearns, made the tactical decision not only not to present a damaged theory of their own, but to embrace the damaged theory of the plaintiff. If you look at the transcript of the charge conference, you will find that the Peninsula counsel, the then Peninsula counsel, made a statement to Judge Fulham that the damages to Peninsula should be limited to some $4.7 million. But they didn't request an instruction on it. But what did they do in the closing arguments? They embraced the plaintiff's damaged claim. They didn't make one of their own. And they argued to the jury that the question before them is who is going to bear this loss? And the loss they conceded was this sum of $33 million. And they argued that while they seemed to concede that the damaged claim was valid, that it would be unfair for the jury to award that damages against Peninsula Bank because it was a small bank and because it hadn't gotten much money from Bentley. That's it. But the case still comes down to at least your first two theories of damages. These are the amounts of money put in plus interest put in by the investors. And you're saying that the money will go back out to the investors. And the question we have, coming back full circle to standing, is that something that we have authority to do? Now, it seems to me that maybe one argument you might have when you look at the Kaplan case and trying to distinguish it is Kaplan said that the old Bankruptcy Act, then in existence, does not give authority for a receiver in bankruptcy under then Chapter, I guess, 10, to go out and to attempt to bring actions on behalf of third-party investors, of third parties. This receiver was appointed at the request of the SEC, was it not? Yes, Your Honor. And it was appointed by the court supposedly under some type of authority given by securities law. Was that correct? Yes, Your Honor. Or was it state law? No, I think it was federal law. Securities law. Okay. Is there something by insecurities law that allows receivers for entities that have purportedly been defrauded to go out and sue on behalf of investors that the old Bankruptcy Act, and now the Bankruptcy Code, after 78, does not give? I don't know the answer to that. And I come back to my point. But isn't that critical? I don't think so. Because Your Honor seems to. I'm trying to throw you a line. Your Honor seems to want to focus on the fact that investors had the same amount of loss that BFS is claiming. And in my view, that is not fatal on a standing question. The question is, can BFS assert a claim that it was hurt by this Ponzi scheme? And let's assume, and it can't be the law, Your Honor, that it can assert that claim only if it keeps the money. That can't be the law. Maybe what I would like both counsel to do, if you could, within the next two weeks from tomorrow, to give us five pages each, as you did last time, as to whether the securities laws might authorize the receiver to bring actions on behalf of investors, realizing that you claim that's not what the receiver was doing here. I understand that. You're saying that the receiver was bringing actions on behalf of BFS. All right. I just want to say one other thing, Your Honor, on this whole question of investor claims. What is really missing from the other side of the aisle is what are the investor claims. Peninsula took the position at trial that the investors had no claims, that its only duty was to Robert Bentley. And so I understand that standing is a legal issue. I understand that. But both McCandless and Kaplan do get into public policy issues. And I would ask the Court to seriously consider that if the Peninsula standing arguments are accepted, then BFS, the entity directly involved in the transaction with Peninsula, has no standing while the investors have no claims. And everybody apparently has. You're saying the investors could not have asserted this deepening insolvency claim. They would not be in a position to do that. Well, clearly they would not have that claim, Your Honor. But the investors have an action now. Against BFS, sure, but. You have an action in Lancaster, is that right? Oh, yes, Your Honor. But as the Peninsula brief describes it, it's the large dollar claims. Now, who are they suing in Lancaster? They're suing Peninsula, and they're suing some of the investors. I've forgotten the theory in that. What is the theory in that action? I'm not sure either, Your Honor. But as I say, the anomaly will be to us, with whom they had the dealings, we have no standing. To the investors, they'll say we have no dealings and, therefore, no obligations. And what has to be understood here, and with all these proper legal arguments, is that the jury found that these people were intentional tortfeasors. And the net result, therefore, has to be considered and factored into an appropriate result. Why don't we hear from Mr. Stearns. By the way, I said two weeks from tomorrow. Why don't we say a week from this Friday, which will be the 12th, 4 o'clock by the 12th, five pages, double-spaced from each side, on whether the securities laws under which this receiver was appointed or whatever laws by which this receiver was appointed gives authority to that receiver to bring actions on behalf of third parties. Thank you, Your Honor. First of all, with regard to damages, it's astonishing that the argument would be made that Peninsula Bank agreed to the damage calculations when Peninsula Bank did its darndest to convince the trial court that the measure of damages of increased insolvency is not a measure of damage in light of civics, which was decided during this trial. So the entire argument was once that case was decided, and I think the court may be a little bit. Well, that's one of the three prongs of their theory of damages. Actually, respect me, Your Honor, it's the only prong. Because when you understand their damage calculations, what they did was they calculated what they said to the jury was the insolvency of the company as of the date of receivership, assets minus liabilities. And then they calculated what was due to investors, and that became a shortfall. So it was insolvency no matter who caused it. No matter what the responsibility was, it was simply a shortfall of investors. There were $400 million. But Mr. Lewis's point is if the jury found that your clients were partially liable for damages done, whether it be to the investors or to BFS, there has to be a mechanism by which they have to pay for their liability. Well, of course, Your Honor. If someone gets involved in a fraud, in this instance, after Peninsula Bank is involved in the fall of 99 and the institution is closed in October of 2001, if in fact new investors came in and lost money and Peninsula Bank was itself not a victim, as it really was, but if in fact Peninsula Bank had not been misled to get in, but was participating in this fraud, why in the world it was putting millions in? But as Your Honor decided in Citrix. But that's an argument to the jury. The point is if your clients were part of the scheme to get mismatched funds in, if they were, and the jury finds that they were liable, they have to be liable for something. Well, I agree. But that's a case, Your Honor, respectfully, to be brought by the investors. The investors can say you were a participant in a fraud that cost me money. What you've just heard is exactly the logic that led to the Kaplan decision. Kaplan goes on at length and discusses the multiplicity of litigation that follows from a receiver prosecuting cases in its own name. Because, as Kaplan points out, the individuals are still suing in their name. So you have one jury determining what amounts to total principal, total interest owed to everyone. Then the money goes to the estate. It goes to pay lawyers. It goes to pay a host of other people. Then the investors are still short, and then who do they sue? And so what the Supreme Court said is no. The receiver tidies up the assets, distributes them to the estate, to the beneficiaries, and the shortfall then is the basis upon which individual plaintiffs who are creditors will make their own decisions as to who caused them harm. But respectfully, the argument that this plaintiff can get increased insolvency damage, think about it, Your Honor, is that after the bank put money in, people put cash into this company in the form of thinking they were buying CDs. So the company, yes, it created a liability in the amount of that cash, but it also got the cash. So just like in SITX, your court said, wait a minute, how could the financial statements that were fraudulent have caused a loss to the company when the money went into the company because of the financial statements? Didn't he just say the company didn't get the money enough? No, the company here did get the money. The company got the money from the investors. He said he went to Entrust instead of BFS. Oh, well, Your Honor, respectfully, you see, Entrust in this instance, this is a shell game too because the receivership estate is Entrust, Bentley, and BFS. They presented financials to the court, but BFS never had a negative net worth. The negative net worth was Entrust. They have a standing problem on a standing problem. They make arguments about Entrust insolvency as a basis for BFS's damage claim. And they consolidate them. And their exhibits all show this consolidated deficiency, and their increased liability is the money that came in. But, Your Honor, we have cited to the court the- Was your client aware that this money was going to go from BFS to Entrust? Our client, respectfully, Your Honor, blew it big time. They thought they had a secured relationship with assets that they had loaned money to. There's no dispute in the record. They were given financial statements that showed that Bentley was profitable, that he had substantial capital. It was a loan relationship, and it was called something else, but at the end of the day, the jury could conclude it was a loan. But they were putting money into these entities, not taking it out. They were loaning money and taking a risk when they were loaning money. As a consequence, what then, this deepening insolvency argument, there wasn't a scintilla of evidence that the insolvency of any of these entities got worse between the time the loans were made. And all you have is new money coming in, but new money matched the new money that was the debt. There was no change in insolvency. Now, Your Honor, respectfully, I give it in our supplemental brief, the opening statement and closing argument that was made in this case. There's just barely no mention of anything except these individuals and their claims. But the judge did tell the jury at one point that this was an action on behalf of BFS. Oh, there's an aside. And that comes down to the question is, can you solve the Kaplan problem as a receiver by doing that? Can you make your entire argument, the moms and pops and little people across the country that you're suing for, so they can be paid so it says, quote, so that all of the victims of the Bentley scheme can be paid what they were owed? That's a quote from the opening. And it goes on and on and on. So can you then at the end say, oh, by the way, this is for the benefit of the corporate entity? The answer is if you can do that, I mean, that's just silly. That just wipes out the whole significance of the intellectual analysis that went into the Kaplan decision. Last point I'd make to you is, in looking at this issue, willful blindness, no civil case has ever taken that criminal concept and applied it in this instance. And the notion that when you look at citics and you see that. Did you object to the willful blindness instruction? The answer is yes and no. The record is not as good as I would like it to be. I didn't detect any objection to that. I would only make the point, Your Honor, is that there is fundamental error. The court can always review it. But as a practical matter, I just want to make the point, this whole notion that this bank that loaned money was found guilty, the guilt that was argued here was the notion of negligence, negligence, negligence. They had a duty. They blew it. And so what we have is by changing labels, by adding a few words, we set aside decades of case law. Thank you. Mr. Mester, do you have anything to add? I should say anything new to add. Yes, Your Honor. Thank you. First, I want to address the court's bringing up the issue of the aiding and abetting in the context of security laws. The court had brought up the central bank case. They're saying it was aiding and abetting not in the context of securities laws, but aiding and abetting in the breach of judiciary duty. Well, whatever was aiding and abetting, this was not a securities law case. And that's what comes back to the issue of the impropriety of including a respondeat superior or charge in the jury instructions. The law is clear. You cannot bring an aiding and abetting claim in the context of a securities law violation. Accordingly, again, it was inappropriate to bring respondeat superior in this case. Second, Mr. Lewis had mentioned, again, this issue of intentional tort feasers. Well, we would contend, Your Honor. Basically, they're arguing that he would – was he your agent and was he acting on your behalf? He was not the agent of Peninsula Bank. No, no, no. No, he was – there was a broker-dealer relationship involved. There's no – not disputed. Was he a broker-dealer or an employee? A registered representative. He was not an employee of Southeastern Securities. He was a registered representative pursuant to an agreement that was entered into, I believe, 1998 or 1999. However, Your Honor, the way that the court instructed the jury in that regard was completely inappropriate. The court basically used a very run-of-the-mill negligence respondeat superior charge, which is if he's your employee, he did wrong, and you were not monitoring his activities, therefore you are vicariously liable for all of his conduct and for all the proximate cause of that conduct. In the context of this case, Your Honor, that charge was grossly inappropriate. We believe it prejudiced the jury, and we believe that it is not only reviewable by this court as an incorrect application of the law, but it is also plain error. Thank you very much. Thank you to all counsel. We'll take the matter under advisement. Since we're going to confer with Judge Weiss very shortly thereafter, we would ask counsel or everyone if they would clear the courtroom, and we will recess and come back in five minutes.